Good morning. I may have pleased the Court, Beyonce Kim for the United States, with me at counsel table is Assistant U.S. Attorney Kevin Rosenberg. I'd like to reserve two minutes of my time for rebuttal. You may, but you'll have to keep track of your own time. That's the entire amount. Thank you, Your Honor. California law imposes independent duties on both doctors and pharmacists to ensure that the prescriptions that are being issued are for legitimate medical purposes. In this case, the district court found, based on the extraordinary dosages and frequencies and number of patients of Dr. Huff, that there was probable cause to believe that Dr. Huff, the doctor in this case, had violated his duties in terms of ensuring that prescriptions were not being But with respect to the Can you just help me out with what are those duties and where are they found? Your Honor, those duties are located in California statute, specifically health and safety code section 11153a. It's that statute, along with 11154a, that states in essence that doctors have a duty under California law to ensure that the And 11153a also imposes an independent corresponding responsibility, that's the phrase in the California statute, on the pharmacists who actually fill these prescriptions. In this case, the district court found, based largely on the dosages in this case, that Dr. Huff had violated his But with respect to the pharmacy, where the overwhelming number of Dr. Huff's patients were going in order to get their prescriptions filled, with respect to the pharmacy, VVP, the district court found that there wasn't probable cause to search the pharmacy, either for evidence relating to Dr. Huff, or for evidence relating to the pharmacist's independent duty and responsibility under 11153a. Well, the pharmacist would have no way of knowing where other patients of this doctor were filling their prescriptions, would he? There's nothing in the record, certainly, and I don't think there are any facts in the affidavit that would  The fact that the overwhelming number of these patients went to this pharmacy doesn't really have anything to do with reason to believe that this pharmacist knew that these were not for legitimate purposes, does it? Your Honor, the principal reason that the pharmacy would have known that these prescriptions were not for legitimate medical purposes was that they were way, way outside of the typical and prescribed limits for these drugs, the Schedule II prescription drugs at issue, the oxycontin pills. Typical, the high end of a typical dosage of oxycontin is four pills a day. Dr. Huff was sending 27 patients to the VVP pharmacy who were being prescribed 1,000 pills a month, which comes out to, I believe, something like 33 pills a day, far in excess of the four pills that are the high end of the typical dosage. With respect to Actic, the website for Actic states that once the patient has been treated properly, there's no need, and a physician should not prescribe more than four lozenges a day. And Dr. Huff was prescribing, and VVP was prescribing these prescriptions of amounts of 16 lozenges, or in some cases six times the maximum dosage. So it's really the dosage that we're talking about, the size of the prescription. It's principally the dosage, Your Honor, coupled with the fact that the pharmacy does have this independent corresponding responsibility under 11-153A to ensure that these dosages, which are not just once a year by one patient, but by a string of patients all referred to the pharmacy by Dr. Huff, that these dosages are for legitimate purposes. These dosages were so far outside of the typical range of dosing that the warrant did fairly demonstrate that there was probable cause, that the pharmacy the evidence of a crime would be found at the pharmacy, certainly with respect to the drugs that Dr. Huff was prescribing and the prescriptions that were being filled there, but also evidence relating to whether the pharmacy also itself was violating its own independent duties. Your Honor, there is also evidence in the affidavit, as I've already discussed, that an inordinate number of Dr. Huff's patients were having their prescriptions filled at VVP. The district court, in finding that the warrant in this case did not demonstrate probable cause, erred in several respects. With respect to the relationship between Dr. Huff and VVP, one of the ways that one of the facts that the district court simply got wrong was that the warrants didn't establish anything with respect to the physical proximity of Dr. Huff's medical offices and the VVP pharmacy. This issue is important because if the VVP pharmacy hypothetically were in the same building as Dr. Huff's offices, then that might create an inference that, well, the reason that all of Dr. Huff's patients or an overwhelming number of them are having their prescriptions filled at VVP is because it's the most convenient place to have those prescriptions filled. In fact, what the warrants establish, and in particular, the addresses of the locations being searched, what those facts establish is that VVP is in an entirely different city from Dr. Huff's offices. VVP is in Ventura, the city of Ventura, in Ventura County. Dr. Huff's offices are in Oxnard. This only increases the suspiciousness of the fact that the overwhelming number of Dr. Huff's patients are being referred to the VVP pharmacy. And referring to Chief Judge Schroeder's question, whether or not the pharmacy knew that this was the state of affairs, those are the facts that were in the warrant that the magistrate judge was able to see, namely that this inordinate number of Dr. Huff's patients were being sent to VVP. Now, there are several possible reasons for that. One of the reasons is that it was simply the most convenient place to go. But given that the pharmacy and the offices were in completely different locations and cities, albeit they're adjacent cities, I believe, if you were to look on a map, I think that that certainly undercuts that reason for why all of Dr. Huff's patients, or an overwhelming number of them, were having their prescriptions filled at VVP. And once that explanation is knocked out, what you're left with is that Dr. Huff is referring an overwhelming number of his patients to VVP, either because VVP and Dr. Huff have some sort of criminal agreement, or Dr. Huff knows that if he sends a prescription in a patient to VVP, VVP will turn a blind eye to the fact that the prescription is far outside the range of reasonableness and fill the prescription anyway. Either way, under both of those theories, there is evidence supporting the theory that Dr. — that Mr. Osar and his pharmacy, VVP, were engaged in criminal wrongdoing. But this Court doesn't even need to reach that issue, because there was certainly — and I don't think it's seriously contested — that evidence with respect to Dr. Huff's crimes, putting aside what — Excuse me just a minute. Assuming for the moment that we agree with you that there was probable cause, what about the breadth of the warrant? The breadth of the warrant, what was authorized to be searched? It seems like it was a rather broad warrant. Well, we'd have to, Your Honor, look at the particular categories that are at issue. The government did concede in the district court that the twelfth category was overbroad and that it referred to any evidence relating to this investigation. In addition, the government conceded that Categories 3 and 4 weren't explicitly tied to criminal violations. But with respect to the other categories, Your Honor, first, there was a preface or a preamble to the search warrant which made clear that any items were to be — were to be — any items that were seized had to be pursuant to some sort of felony. So just as in the Hayes case, there was that limitation. And as the district court found with respect to the overbreadth argument made with respect to Dr. Huff's search warrant affidavit, the remaining search warrant categories were specific enough to allow agents executing the warrant to — to reasonably be able to determine what fell within and outside of the categories. Certain of the categories, Your Honor, for example, the computer search categories, Categories 10 and 11, those categories fairly read within the context of what the search warrant was all about, and in particular, the fact that the agents were only to seize evidence of a crime. This Court held in — in Hayes, for example, that similarly broad computer search warrant language was appropriate in a similar kind of search warrant. And so, in this case, the search warrant did not limit the search to records relating to Dr. Huff and his patients. Yes, Your Honor, that's correct. Is there anything in the record to suggest that any physician other than Dr. Huff was using this pharmacy to overprescribe? No, Your Honor. There's nothing in the record and there's nothing in the affidavit. Again, the affidavit establishes a very close relationship between Dr. Huff and this pharmacy, and it looks at the differential. Well, my — certainly it would suggest to me, at least, that you could seize records relating to Dr. Huff, but why records relating to every other doctor who wrote a prescription was filled at the pharmacy? Well, Your Honor, I think that if we're assuming, for the purposes of argument, that the search warrant was only to search for evidence of Dr. Huff's criminal wrongdoing, I think that evidence relating to what other doctors were doing would be relevant to showing whether Dr. Huff's prescriptions were far outside the range of reasonableness or not. They would also, Your Honor, be important in showing other doctors who might be working with Dr. Huff and certainly other patients of Dr. Huff that weren't known to law enforcement before the search that might have been having prescriptions illegally. So there was no probable cause to believe that any other physician was doing what Dr. Huff was doing? That's correct, Your Honor. That's correct. And — So simply going in and looking for evidence that some other doctor were doing what Dr. Huff was doing would not be proper, would it? And that wasn't the purpose of the search warrant. But the search warrant, Your Honor, was also intended to find evidence of VVP's criminal wrongdoing on — based on the facts that we've already discussed, namely the fact that VVP was extremely closely working with Dr. Huff and the fact that the VVP was in the same building as the district court mistakenly believed in reaching a contrary decision as to the warrant. How does that relate to the records of Dr. Smith or Dr. Jones? It might also — or the records relating to prescriptions for patients of those doctors? Well, let's — if the pharmacy, VVP, is criminally filling these prescriptions by Dr. Huff, then it would be very probative to know if they're also engaged in similar practices with respect to other prescription drugs or other doctors. They had no probable cause to believe they were engaged in that with other doctors, did you? Well — There was no evidence of that. Well, Your Honor, the evidence supported a conclusion that the pharmacy was violating 11-153A, which prohibits pharmacies from simply filling prescriptions given to them by doctors that they know are outside the medical practice of the doctor or are not for legitimate medical purposes. So defined relatively broadly in that way, I think that it would have been fair game for the agents to be able to obtain records of VVP with respect to other prescriptions that they were filling and other doctors to see whether this 11-153 criminal conduct that they were engaged in was simply limited to Dr. Huff or extended more broadly. There is evidence, Your Honor, that Dr. Huff used another pharmacy, all-med drugs, and I think that it's fair, based on the facts set forth in the affidavit, to believe that there may have been other doctors as well. And I think — I think so because I don't see that in the affidavit. So assuming that the target is Dr. Huff and the pharmacist, what — and you can see that there is some overbreadth. We did concede that, yes, Your Honor, below. But what does that do? Where does that leave us? If you throw out, what is it, 12? Your Honor, let me address that question. And then before I get to that question — and three and four, Your Honor.  that's all of the above, hard disks, all the computers, everything, calculators, everything. All the records of the whole pharmacy. Yes, Your Honor. The district judge explicitly, expressly did not reach the issue of overbreadth because it found that there was improbable cause. So — Yeah, well, I'm trying to get you the next — Exactly. So what next? One possibility is for the court to remand to determine whether there's any evidence that was actually seized pursuant to Category 12. I believe that the record establishes that there wasn't, in fact, any evidence that was seized specifically pursuant to Category 12, in which case that provision drops out and there's really no real effect or need for further findings by the district  But certainly on remand, the district judge would be able to determine whether, in fact, there might have been evidence seized pursuant to 12 or 3 and 4 or any other category and make a determination as to whether that evidence fell within which categories. The district judge didn't engage in that kind of inquiry because it didn't reach the issue of overbreadth. With respect, Your Honor, to both your question and Judge Sedgwick's question on whether there might have been other doctors involved, I would just note that there is, I believe, in the affidavit a discrepancy. That is, Dr. Huff is prescribing a very large number of oxycontin pills, and he accounts for a very large number of, I believe, the California billings, insurance billings, for these kinds of drugs. And I don't believe that VVP is VVP's billings encompassed only Dr. Huff's oxycontin prescriptions, the implication simply being that there were other doctors prescribing oxycontin that ---- Kagan. Let me, I just, we're going to, we almost used your time, but the, if this, just procedurally, this came up solely on Mr. Ozar's motion, was this procedurally, were there two separate proceedings with respect to Ozar and Huff? Your Honor, there was one argument on both of the two separate motions. And the district judge scheduled the arguments at the same time, essentially, and had government counsel address both of the motions. And there was some blurring. And what did the, what did the district do with, court do with respect to Huff? With respect to Dr. Huff's motion to suppress, that motion was denied. Because the district judge found that there was probable cause based largely on the dosages and frequencies that they had ---- With respect to Ozar, the problem was that the affidavits in the district court's view, I take it, did not adequately establish probable cause to believe that he was knowingly, was overprescribing his medication. That's absolutely correct, Your Honor. And our position, just to summarize before I sit down, is that the district judge overlooked and mistakenly overlooked certain facts that, in fact, did establish probable cause with respect to VVP. And then even if VVP was not criminally involved, there was certainly a basis for searching for evidence relating to Dr. Huff, given that this was the pharmacy where most of his patients were having their prescriptions filled. The district judge simply overlooked that theory entirely. I'd like to reserve the remainder of my time for rebuttal. Good morning, Your Honors. Victor Sherman and Janet Sherman on behalf of the appellate. First of all, the government's argument as to the district court's ruling on Dr. Huff and Dr. Ozar is completely untrue. And I'm really shocked that the government would come up here and say that the district court made a decision based upon the dosage for Dr. Huff. That's absolutely incorrect. And all you have to do is read the decision of the district court. And the district court found that the reason he denied the motion for Dr. Huff is because he found, based upon the affidavit, that Dr. Huff did not prescribe the prescriptions within the normal course of his medical practice. He specifically found that the doctor performed no examination, took no histories, performed perfunctory examinations, I'm reading right from his decision, took cursory histories before prescribing the large quantities of painkillers. He also went into the, I mean, I don't even have to get into all the details, but I mean, to say that it was on the dosage is completely untrue. Then, for the government to say that there's this close relationship between Dr. Huff and Dr. Ozar, some kind of criminal conspiracy, the government conceded during the district court argument that there was no such relationship between the two. The two barely knew each other. There was no money passing hands back, I mean, passing back and forth between the parties. There were no telephone calls, no relationships at all. They were completely independent. And so that the only thing that the government had regarding Dr. Ozar was the fact that he filled the prescription. Then the government comes up here and says... Are you saying that we're supposed to assume that these dosages were perfectly fine? Oh, absolutely. Not only that, the... all of the literature says that there is no maximum dosage for pain medication and that doctors are encouraged to prescribe pain medication without concern about the amount of pills that they prescribe to any particular person. And I'll just go through very quickly. The literature from the manufacturer says that, and I'm quoting from page 11 of our brief, that for pure opiate analgesics, there is no defined maximum dosage. Congress has passed a law, 21 U.S.C. section 396, it says, that Congress, and there should be no law to limit or interfere with the authority of a healthcare practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate healthcare practitioner-patient relationship. The DEA put out, specifically on OxyContin, I'm quoting from page 16 of our brief, provided there is a legitimate medical need, a practitioner may issue a prescription to any patient for any quantity of any controlled substance that he or she deems medically appropriate. There are no limits on the quantity of controlled substance dosage units under federal law or regulation that a practitioner may prescribe. So the manufacturer, the FDA, by the way, also says there's no maximum limit. The DEA, Congress, and also under California law... Are you talking about overall or per patient? I'm talking about per patient. And the tolerance for a particular patient depends upon the patient and the individual needs of the patient. Some patients maybe should give four pills a day. By the way, the affidavit doesn't talk about any dosage. So it could be 10 milligrams, 40 milligrams, 80 milligrams. So the number of pills doesn't really make the difference. It's the dosage that you would think would be important and the affidavit doesn't even talk about dosage. But the California Medical Board's guidelines for prescribing controlled substance for pain, quoting, are intended to promote improved pain management for all forms of pain and for all patients in pain and to assure practitioners that physicians and surgeons who prescribe opiates, either for acute or persistent pain, should not fear disciplinary or other action from California law enforcement or regulatory agencies for the mere fact of having prescribed opiates. So we have the California Medical Board, we have the DEA, we have the manufacturer, we have the FDA, we have Congress, all saying that as long as you are filling a prescription or in fact within the medical practitioner relationship, you are prescribing pills for a medical purpose, these other people have to stay out of it. It's between the doctor and the patients. And that some people have great tolerance for pills and over a period of time, their pain may be such that you should take a pill every three or four hours. But anyhow, that's a decision for the doctor, not for this court to step into and say, oh, this is too many pills. Now, in this particular case, they were so sloppy, again, they never mentioned dosages. And what's really critical is the affiant in the affidavit completely omitted the fact that the literature from the manufacturer says there is no maximum dosages, eliminated the FDA, the congressional statement that I've made, the statute from the California Medical Board's guidelines, the patient's bill of rights, all of this which says, hey, it's up to the doctor to decide how much pills anyone should have. Now, in this particular case, not only did the pharmacy, this particular pharmacy fill prescriptions, but there were four or five other pharmacies that filled prescriptions for Dr. Huff, that filled prescriptions for this amount or more of the same kind of prescriptions that Dr. Huff did for this particular pharmacy, including Long's, which is a national distribution, a national retailer. So it wasn't only Dr. Ozar that was filling the prescriptions. There were other pharmacies that were doing exactly the same thing. Now, to get back to Your Honor's question about the overbreath. This warrant had nothing to do with Dr. Huff, really. It went in there and it was wholesale, hey, go in there and take whatever you want from Dr. Ozar, everything that is imaginable, because we think, in their opinion, without any professional opinion, and contrary to the literature, because we think he's filling prescriptions which he shouldn't be filling. So go in there and, you know, open season on Dr. Ozar's business, and that's what they did. And now for them to say that, oh, well, sever basically the 12th one, which says take everything, anything related to the investigation, and we'll just pretend that didn't exist, and we'll pretend that they went under items 1 through 11 and were very specific. There's no evidence of that. And obviously, that's impossible in the event. The officers went in thinking they could take everything, and they took everything. You know, if they had gone in with a similar warrant, but had said that they wanted to search for evidence of Huff's criminal activity, it was probable cause to believe that there was evidence of Huff's criminal activity here. We, and that was it, and then they were later to bring a prosecution against it. This, the pharmacist having looked at these records and looked at the number and said, oh, my gosh, this is, he's filling 20% of all of California's prescriptions for noxicantin, or whatever it was, that we really wouldn't be here, would we? Well, it seemed to me that it was, the hook here is the allegation here that the pharmacist knew what was going on. Well, first of all, I'm not sure of the question, because there is no evidence that the pharmacist knew what was going on. And they conceded that, that there was no evidence that the pharmacist knew what was going on in the district court. The district court just specifically asked the government, are you claiming that? That's what I, that's how I read it, that that was really the basis. Yeah, the judge specifically asked the question, do you have any evidence that Dr. Ozar and Dr. Huff were in collaborations in any way? And pretty much like they sort of concede today, they concede in this, no, we don't have any such evidence. Now, if they would have gone in just to look for Dr. Huff's criminality, maybe if they would have been very specific and said, OK, why would they really need to go to the pharmacist really to even look for Dr. Huff's evidence? Because they had that all from Dr. Huff's already. So I don't think the pharmacist would have really added anything. But they didn't so narrowly tailor it to look for Dr. Huff's material. And the affidavit specifically said they thought the pharmacist was part of the criminal behavior. So they weren't going in just to look for Dr. Huff's material. Anyhow, this, now, I think there should be some deference also to the district court because he did, you know, he denied the motion for Dr. Huff. So he carefully looked at it. This wasn't just like, OK, I'm going to look at this affidavit and not make distinctions. He made very distinct differences between the affidavits. The probable cause of the question is whether or not they were appropriate distinctions, I guess. Well, of course. But I mean, he carefully considered the evidence and he did issue a 16 page or excuse me, an 18 page decision in this case where he carefully went through the evidence for Dr. Huff and the evidence for Dr. Ozar. And he found plenty of evidence for Dr. Huff and he found zero evidence for Dr. Ozar. There was plenty of probable cause to think that there was evidence of criminal evidence that related to criminal activity here. That the prescriptions, the price that was paid, the amount, the whole. Well, as far as Dr. Huff. Yeah, well. But for Dr. Ozar, he found nothing. And he, in fact, it was so bad, he said no reasonable officer could possibly. Well, but they wouldn't have needed to have evidence, would they, of Ozar's knowledge of this scheme in order to go in and search the pharmacy for records of criminal activity. Of Dr. Huff? But they would have needed some, they would have needed. Certainly of Dr. Huff. But they would have needed, obviously an affidavit has to have probable cause to search for criminality of Dr. Ozar or somebody at the pharmacy. If that's the question, they just can't have a phishing expedition, just issue an affidavit. No, if they know that, if they are aware that Huff's prescriptions are being filled there, they have enough to go in and search for the records of the prescriptions that Huff was prescribed. Well, I'm not sure. I mean, I would think that there's other ways to do it, certainly by subpoena. But they'd have to show there was probable cause to believe something was happening. Well, I suppose they could look, they certainly could look for Dr. Huff's criminality if they wanted to. They could have searched this pharmacy. Okay, but that's not what they did. Well, they did search the pharmacy. They did search the pharmacy, but they weren't searching, they were limiting it to the criminality of Dr. Huff. They were saying that Village Pharmacy was involved in this conspiracy or criminal activity, and they just wholesale took all the records from the pharmacy. Can I reserve, like, I think I have about three minutes left. You're not coming back, Mr. Chairman. I mean, this is... Does the Court have any other questions? I don't think so. Thank you. Your Honor, with respect to the overbreadth issue, the Defendant Counsel asserts that they took everything. There's nothing in the record indicating that. In fact, what the record does indicate that they saw certain things that, although fairly encompassed by, let's say, the twelfth category, the prescription bottles, they didn't seize those bottles, but in fact went back to the magistrate court and obtained a second search warrant. That certainly indicates that there was a good-faith attempt to really focus on... The record. That's right. They took everything with respect to the record. That's right, Your Honor. With respect to the deference to the district court, this Court has established that review is de novo and that no particular deference need be given to the district court whatsoever. With respect to the dosages not being a basis of the district court's decision, I would direct the Court to GER 462, page 7 of the district judge's decision. If you look at this itemization of all of the factors establishing probable cause, you'll see that the first five or six, at least, all would apply equally to Mr. Ozar and VVP. With respect to whether the government conceded that there was no evidence of a conspiracy, that's not. In fact, the government did not say that in the district court. But regardless, whether there was a conspiracy or whether Dr. Huff sent these patients to VVP because he knew VVP was going to turn a blind eye, either way, that supports probable cause with respect to VVP. Finally, Your Honor, with respect to the issue that they devote a lot of attention to and time in their brief on whether there are limits on the amount of dosages that can be prescribed, most of the literature that they cite is simply outside the four corners of the affidavit. It's simply inappropriate for this Court to review. The question is whether looking within the four corners of the affidavit, whether the State court had a fair probability of believing that evidence would be found. Thank you. Kagan. Thank you. The case just argued is submitted. Shall we?
judges: Schroeder, Goodwin, Sedwick